United States Courts
Southern District of Texas
**FILED**
January 10, 2022
Nathan Ochsner, Clerk of Court

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Texas

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)   Case No.   **4:22-mj-0044**
The Law Offices of Richard J. Plezia and Associates )
2909 Hillcroft Ave., Suite 575 )
Houston, TX 77057 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____Texas_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371 | Conspiracy to defraud the United States |
| 18 U.S.C. 1001 | False Statements |
| 18 U.S.C. 1519 | Falsification of Records |

The application is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert Simpson, Special Agent, IRS-CI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means).*

Date: _____January 10, 2022_____

_____
*Judge's signature*

City and state: _____Houston, Texas_____   Andrew M. Edison, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

I, Robert Simpson, being duly sworn, depose and state the following:

1.   I am a Special Agent with the Internal Revenue Service – Criminal Investigation (IRS-CI), United States Department of the Treasury, and, as such, I am empowered to make arrests and to obtain and execute search, seizure, and arrest warrants. I am currently assigned to the Houston Field Office of IRS-CI and have been so since 1993. I have conducted and participated in scores of investigations involving felony violations of Title 26 of the United States Code (tax violations) including tax evasion, aiding and assisting in the filing of false tax returns, attempts to interfere with the internal revenue laws, and conspiracy to defraud the United States. I also have extensive experience in the investigation of other financial crimes, including money laundering, bank fraud, wire fraud, mail fraud, illegal gambling operations, and identity theft.

2.   I am making this affidavit in support of an Application for Search Warrant for the following premises:

The Law Offices of Richard J. Plezia and Associates located at **2909 Hillcroft Avenue, Suite 575 , Houston, Texas 77057**. More specifically, this warrant seeks authority to create a forensic computer image of electronic data storage devices located at the above address.

3.   I base the information outlined in this affidavit on personal observations and knowledge, information obtained during the execution of an undercover operation, and my training and experience in the investigation of financial crimes. The facts set forth in this affidavit are not the only facts known to your affiant, they are only the facts set forth for the limited purpose of establishing probable cause that evidence of federal crimes, namely conspiracy to defraud the United States in violation of 18 U.S.C. § 371; false statements in violation of 18 U.S.C. § 1001; and falsification of records in violation of 18 U.S.C. § 1519, exists at the aforementioned premises.

### Background of Investigation

4.   Richard Plezia is currently under indictment in the Southern District of Texas for conspiring to defraud the United States in violation of 18 U.S.C § 371 (Criminal No. H-19-450; United States of America v. Jeffrey Stern, Lamont Ratcliff, Deborah Bradley, Richard Plezia). Additionally, the Southern District of Texas has sought and received approval from the Department of Justice Tax Division to charge Plezia with falsification of records in violation of 18 U.S.C. § 1519 and making false statements in violation of  18 U.S.C. § 1001. The pending conspiracy charge against Plezia stems from a grand jury

1

investigation involving, among others, Marcus Esquivel and Jeffrey Stern. Esquivel was a "case runner" who illegally acquired and sold plaintiffs' cases to various personal injury attorneys, including Plezia and Stern, in violation of state law. Stern was a personal injury attorney who engaged in a tax evasion scheme that involved funneling illegal payments to case runners through other personal injury attorneys. That is, Stern, when making a kickback to a case runner, would write a check payable to a complicit attorney, including Plezia, and then deduct the payment on his tax returns as a legal referral fee to another attorney. The receiving attorney would then make a commensurate payment to the case runner of Stern's direction. In this manner, Stern was able to both disguise and take a tax deduction for his illegal case-running payments. Stern, Esquivel, Plezia, and three other individuals were indicted as a result of the grand jury investigation. The conspiracy charge against Plezia resulted from a series of payments, totaling approximately $500,000, that were funneled from Stern to Plezia and then from Plezia to Esquivel. Stern deducted the payments from him to Plezia as legal referral fees when, in fact, the payments were largely illegal kickbacks to Esquivel. This resulted in substantial tax savings to Stern. Plezia recorded the checks from Stern as income on his law firm's books and records, but largely offset the income by disguising his subsequent payments to Esquivel's entities as legitimate marketing or advertising expenses. Thus, the tax effect on Plezia was negated on some payments or minimized on other payments. A summary of the payments is attached hereto as Schedule 1. As reflected on the schedule, there were 23 payments made between January of 2011 and December of 2013. Generally, Stern would write a check payable to Plezia's law firm. Then, the same day or within a few days, Plezia would write a check or checks for exactly or very near the same amount payable to one of Esquivel's business entities, BelMark International or LeReve Advertising. In the latter half of 2013, Esquivel began depositing checks payable to Plezia from Stern directly to Esquivel's own bank accounts.

5.  Early in the grand jury investigation, before investigating agents had discovered the connection regarding payments from Stern to Plezia, Plezia was interviewed about a series of checks he had written to entities controlled by Esquivel. Plezia told investigating agents that he had never paid Esquivel for a specific case, which would be a violation of state barratry laws, and that the payments from his law firm to Esquivel's entities were payments for legal advertising, marketing, and investigative work performed by Esquivel. Later in the investigation, after the pass-through nature of payments from Stern to Plezia and then from Plezia to Esquivel had been realized, Plezia was served a grand jury subpoena seeking records related to the specific payments. Additionally, Plezia was interviewed for a second time. Plezia told investigating agents that the series of payments that flowed through him from Stern to Esquivel were part of an agreement between Plezia and Stern. Plezia stated that Stern had agreed to fund up-front investigative work performed by Esquivel on Plezia's behalf for a mass tort litigation involving a benzene

release from a British Petroleum (BP) refinery in the Houston, Texas area. In exchange, Plezia had allegedly agreed to pay Stern a percentage of the attorneys' fees from any future settlement involving the BP benzene release litigation. In support of his statement, and in response to the grand jury subpoena, Plezia provided a copy of a purported letter agreement dated August 24, 2010. The letter, which had been signed only by Plezia and allegedly faxed to Stern, outlined the alleged agreement as described by Plezia.

6.    Marcus Esquivel was indicted on four counts of knowingly filing false tax returns in violation of 26 U.S.C. § 7206(1). Esquivel pleaded guilty to all four counts, without a plea agreement, and is currently cooperating with the government. Jeffrey Stern was indicted, with Plezia and four others, for, among other crimes, conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Stern has pleaded guilty to the conspiracy count, as well as another substantive tax count, and is currently cooperating with the government. Post-indictment statements to investigating agents by Esquivel and Stern, when coupled with substantial documentary evidence, confirm that Plezia knowingly made false statements to federal agents during both of his interviews. Additionally, the purported August 24, 2010 letter agreement provided by Plezia to corroborate his statements is a fraudulent document and the agreement it purports to memorialize never existed. Rather, payments from Plezia to Esquivel's entities are either: 1) direct kickback payments from Plezia to Esquivel on specific cases Esquivel sold to Plezia, or; 2) kickback payments and personal loans from Stern to Esquivel that were merely passed through Plezia's law firm to disguise Stern's involvement.

### Evidence of False Statements by Plezia In His First Interview

7.    In his initial interview with IRS-CI on December 7, 2016, Plezia stated he never paid Esquivel for a specific case referral (barratry). This statement is material because the primary motivation for Stern, Plezia, and others to disguise the nature of their payments to Esquivel was to conceal the fact that the payments were illegal. In interviews with the government following his guilty plea, Esquivel has stated that Plezia paid Esquivel a kickback 20% of Plezia's attorney's fees on settled cases referred by Esquivel to Plezia. Additionally, Esquivel has provided copies of ledgers he maintained reflecting his referrals to various attorneys, including separate ledgers for Plezia and Stern. Esquivel's statements that Plezia did, in fact, pay him illegal kickbacks on specific cases are corroborated by his ledgers and by documentation obtained from insurance companies involved in the particular matters.

8.    Page 6 of Esquivel's Plezia ledger appears to reflect the computation of a kickback in the amount of exactly 20% of attorney's fees on personal injury cases related to plaintiffs "Goodman" and "Harris". Other pages of Esquivel's ledger make reference to "Dane Goodman" and "Demetric Harris." Insurance

files obtained from Farmers insurance company reflect that Farmers did, in
fact, pay settlements to plaintiffs named Dane Goodmon and Demetric Harris,
that those plaintiffs were represented by Richard Plezia, and that a lawsuit had
been filed in the matter, which would entitle Plezia to attorney's fees equal to
40% of the gross settlement on the cases.  The Farmers insurance file also
contains a letter, signed by Plezia in April of 2012, to Farmers' outside
counsel accepting settlement offers in the amounts of $35,000 for Goodmon
and $12,000 for Harris.  Esquivel's ledger contains a notation of "14,000"
next to Goodman's name and "4,800" next to Harris' name.  14,000 is exactly
40% of 35,000 and 4,800 is exactly 40% of 12,000,  which would have been
the amounts due to Plezia as attorney's fees on the cases.  After reductions in
attorney's fees for each client which are reflected on the document, Esquivel's
ledger reflects the multiplication of the sum of the remaining attorney's fees
by 20%, the amount of the alleged kickback.  The resulting product is
$2,527.79.  After subtracting a $2,000 advance already provided and notated
in the ledger, the remaining kickback due to Esquivel, according to the ledger,
is $527.79.  On August 9, 2012, Plezia wrote a check to one of Esquivel's
entities in the amount of $527.79.

9.      Esquivel's statements regarding Plezia's payments for specific case referrals
        are also corroborated by page 18 of his Plezia ledger, which reflects an
        "MVA" (motor vehicle accident) referral from Esquivel to Plezia involving
        plaintiffs Benjamin Vizuet, Noel Vizuet, and Yulissa Vizuet.  Farmers
        insurance company files reflect that Plezia sent a demand letter to Farmers as
        the attorney representing those specific individuals, confirming that Plezia
        represented the individuals listed in Esquivel's ledger.  In the demand letter to
        Farmers, Plezia states that Benjamin Vizuet had incurred $4,302.13 in medical
        expenses related to the accident.  Page 18 of Esquivel's ledger reflects the
        number "4302.13" written next to Benjamin Vizuet's name.

10.     Esquivel's ledger contains additional corroboration of selling cases to Plezia
        on Pg. 17.  The ledger reflects notations for "12K   Jasmine Martinez" and
        "6K  Anthony Juaregi" and an additional notation of "Palmer" next to the
        names.  Insurance records received from State Farm reflect that Plezia
        represented plaintiffs named Jasmine Martinez and Anthony Juaregi in an
        MVA personal injury suit and that Plezia sent a demand letter to State Farm
        stating that both plaintiffs had received medical treatment at Palmer Highway
        Chiropractic.  Additionally, State farm provided copies of settlement checks in
        the amounts of $12,000 for Jasmine Martinez and $6,000 for Anthony Juaregi,
        the exact amounts notated in Esquivel's ledger.

11.     Additional corroboration of Esquivel selling cases to Plezia is also contained
        on Pg. 17.  On the page, notations are made for "10K  JM Peekil" (referred to
        as James Peekil on other pages of the ledger) and "3K  Ralph McIlellen"
        (referred to as Ralph McClain on other pages of the ledger).  State Farm
        records indicate that Plezia represented plaintiffs James Peek and Ralph

McClain in an MVA personal injury suit and that the cases had settled for $10,000 and $3,000, respectively.

12.     Page 17 of Esquivel's ledger also contains a summation of various settlement amounts, including Jasmine Martinez's $12,000, Anthony Juaregi's $6,000, James Peek's $10,000, and Ralph McClain's $3,000. The sum is then multiplied by 40%, which would reflect Plezia's attorney's fees. That product is then multiplied by 20%, which would reflect Esquivel's cut of Plezia's attorney's fees and corroborates Esquivel's statements.

13.     Esquivel has stated that he met with Plezia after both men had been contacted by the government during the investigation. According to Esquivel, Plezia stated that he had tried to throw the government off track. This statement is corroborated by Stern, who also met with Plezia after Plezia had been interviewed by IRS-CI agents the first time. According to Stern, Plezia indicated to Stern that Plezia had attempted to send the government in a different direction.

**Evidence of False Statements in Plezia's Second Interview and of Submission of a False Document (August 24, 2010 Letter Agreement)**

14.     As stated above, Plezia was served a grand jury subpoena requesting documentation relating to a series of payments of approximately $500,000 that flowed from Stern to Plezia and then from Plezia to Esquivel. In a subsequent interview, Plezia maintained the payments are for Esquivel's work in the BP benzene release and pursuant to the alleged August 24, 2010 letter agreement he provided in response to the subpoena. In the alleged agreement, Stern agrees to pay for Esquivel's work on the BP benzene matter in exchange for a percentage of Plezia's future attorney's fees on the matter.

15.     In post-plea statements provided to the government, both Stern and Esquivel state that the approximately $500,000 in payments that flowed through Plezia from Stern to Esquivel were either illegal kickbacks, illegal kickback advances, or personal loans from Stern to Esquivel. Both Stern and Esquivel state that Esquivel discussed the flow of funds with Plezia and that Plezia agreed to allow it. Both Stern and Esquivel state that the series of payments is completely unrelated to the BP benzene matter. Additionally, both Stern and Esquivel stated that they did not believe that they had ever seen the purported August 24, 2010 letter agreement prior to discovery in the pending case and that they believed the document to be a fraud. Esquivel stated that he thought the letter agreement was an attempt by Plezia to explain the series of payments that flowed from Stern to Plezia to Esquivel. Stern stated that he was not involved in the BP benzene matter, that he never agreed to fund any efforts by Esquivel on the matter, that he never discussed the matter with Plezia, and that the August 24, 2010 letter was "a complete false narrative." Stern's interview with the government occurred on February 26, 2021.

16.     Esquivel's and Stern's statements regarding the true nature of the $500,000
        that flowed through Plezia are corroborated by Esquivel's ledgers, court
        filings, financial records of Stern's law firm, bank records, and other
        correspondence. As previously stated, Esquivel has provided copies of his
        ledgers to the government following a guilty plea in the case.  One of the
        ledgers provided by Esquivel purports to reflect kickbacks and advances
        received from Jeffrey Stern.  Several of the payments in the ledger can be tied
        directly to checks issued from Stern to Plezia and corresponding checks issued
        from Plezia to Esquivel.  All of the identifiable checks relate to kickbacks
        from Stern or loans from Stern to Esquivel; none of the checks can be tied to
        the BP benzene release.

17.     Seventy-five thousand dollars' worth of payments on Esquivel's ledger which
        can be tied to specific Stern clients are three $25,000.00 payments which,
        according to the ledger, are for plaintiffs Michael Stewart, David Kelley, and
        Byron Bledsoe, all of whom were injured in an explosion at Enterprise
        Refinery in Mont Belvieu, Texas, which is in Chambers County.  These three
        payments are all part of the $500,000 that flowed from Stern through Plezia to
        Esquivel and are reflected on Schedule 1.  Esquivel's ledger makes reference
        to these plaintiffs on pages 8, 52, 55, 59, 61, 66, 85, and 57.  Page 57 lists the
        dates of the payments, two of which tie exactly to checks issued by Stern to
        Plezia, and the third of which closely approximates a check from Stern to
        Plezia after accounting for an apparent typographical error in the year of the
        payment.  Specifically, Stern had issued a $25,000.00 check to Plezia on April
        28, 2011 and Plezia followed with a $25,000.00 check from his law firm to
        one of Esquivel's business entities on April 29, 2011.  Esquivel's ledger lists
        the date of the payment as "5/2010," but the entry is in a list of payments
        made in 2011, directly between one made on April 18, 2011 and one made on
        June 23, 2011.  The fact that Stewart, Kelley, and Bledsoe were Stern clients
        is corroborated by attorney Mark Collmer.  Collmer stated that the three men
        were Stern's clients, that Stern was sharing the case with attorney Rob
        Ammons, and that Collmer made a payment to Esquivel related to the case on
        Ammons' behalf.  Collmer provided a letter corroborating his statement.
        Collmer is corroborated by Esquivel, who provided a signed copy of the same
        letter, as well as by the original plaintiffs' petition on the case, which was
        filed in Chambers County, Texas by Rob Ammons.  Additionally, the fact that
        Stewart, Kelley, and Bledsoe were Stern clients is corroborated by numerous
        checks issued by the Stern law firm to each of the men as advances during the
        pendency of their cases.

18.     Another Esquivel ledger payment which can be directly tied to a Stern case is
        a $25,000.00 payment on July 10, 2012.  Specifically, page 67 of the
        Esquivel's Stern ledger reflects a $25,000 payment related to plaintiff
        Qulinton Cams on July 10, 2012.  This payment is also part of the $500,000
        that flowed through Plezia and is reflected on Schedule 1.  Stern did, in fact,

write a check to Plezia on July 10, 2012 in the amount of $25,000. The very same day, Plezia wrote a check from his account to one of Esquivel's entities in the amount of $25,000. Cams is referenced on Esquivel's ledger on pages 22, 52, 55, 59, 60, 66, 67, and 83. Pages 52 and 67 of the ledger reference the exact date and amount of the payment from Stern to Plezia. Pages 22 and 66 reference "burns," which coincides with the allegations in the Plaintiff's Original Petition filed in the case, which references hot liquid being spilled on Cams. The petition was filed by Stern's law firm. In addition, check stubs recovered during a search of a storage unit for Stern's law firm reflect payments from Stern's firm to Cams, further corroborating that Cams was a client of Stern, not Plezia, and that his case was not related to the BP benzene release.

19.     Another payment in the $500,000 that can be traced through Plezia is a $35,000 payment indicated on Esquivel's ledger as being made on November 27, 2012. Page 60 of the ledger appears to indicate, and Esquivel confirms, that the payment is related to several individuals, including Jared Bean, Veejay Manahan, and Chinh Vo. Stern did, in fact, write a check to Plezia in the amount of $35,000 on November 27, 2012. The next day, November 28, 2012, Plezia wrote a check to one of Esquivel's entities for $35,000. Bean, Manahan, and Vo are all confirmed to be plaintiffs represented by the Stern Law Group. Evidence of Stern's representation includes Plaintiffs' Original Petitions for Bean and Manahan, both of which were filed by Stern's law firm. Page 24 of Esquivel's ledger references "HEB" in relation to Bean, which correlates to the defendant in Bean's lawsuit, HEB Grocery Company LP. Additionally, a stub for a $235.00 check payable to the Harris County District Clerk for the filing of Bean's lawsuit was seized from Stern's records during a search warrant. Settlement proceeds deposited to the bank of account of Stern's law firm on behalf of Chinh Vo confirm that Vo was a client of Stern's. Bean, Manahan, and Vo are also referenced on pages 26, 55, and 60 of Esquivel's ledger. Page 60 lists the exact date and amount of the payment from Stern to Plezia.

20.     Page 60 of Esquivel's ledger also reflects a $35,000 payment made on October 4, 2012 for several individuals, including Doree Tratwaller and Josephina Palacios. This payment is one that flowed through Plezia and is reflected on Schedule 1. As reflected on page 83 of Esquivel's ledger, Tratwaller is actually a misspelling of the plaintiff's true name, Duree Trautwein. Trautwein/Tratwaller is a confirmed client of the Stern Law Group. Numerous check stubs seized from Stern's records during the execution of a search warrant confirm that Trautwein was a client of Stern's. Palacios was also a documented client of Stern's, as indicated by check stubs seized from Stern's records. Page 61 of Esquivel's ledger contains the notations "broken rib" and "10/13/2011" in relation to Palacios. A petition filed on Palacios' behalf with the Harris County District Clerk states that Palacios was injured on or about October 13, 2011 and suffered fractured ribs.

Stern did, in fact, write a check for $35,000.00 to Plezia on October 4, 2012. The same day, Plezia wrote a check for $35,000.00 to one of Esquivel's business entities. Trautwein/Tratwaller is also mentioned on pages 10, 55, and 59 of Esquivel's ledger. Page 60 lists the exact date and amount of the payment from Stern to Plezia.

21. Another payment reflected on Esquivel's Stern ledger is a $30,000.00 payment on August 21, 2012. Stern did, in fact, issue a check to Plezia for $30,000.00 on August 21, 2012. The next day, Plezia wrote a $30,000.00 check to Esquivel's company, BelMark International. Both of these checks are reflected on Schedule 1, the listing of payments that flowed from Stern through Plezia to Esquivel. Page 52 of Esquivel's ledger, which lists the exact date and amount of the payment, indicates that the payment was for clients "Porter, Perry, Cathy Brown, Moralez." Review of additional pages of the ledger, including pages 24, 55, 59, 60, 61, and 66, reveal that "Porter" refers to Edith Porter. Check stubs seized from Stern's records reveal that Edith Porter and a Kathy Brown were clients of Stern's. Pages 24, 55, and 66 of Esquivel's ledger reference "Tractor Supply" in relation to Cathy Brown. A Plaintiff's Original Petition was filed in Walker County, Texas on behalf of plaintiff Kathy Brown. The defendant in the suit was Tractor Supply Co. of Texas, LP. The filing fee for the suit was paid by Adam Flood, who is an employee of the Stern law firm. A check stub in the amount of $235.00 seized from Stern during the execution of a search warrant ties to the filing fee date and amount; the check stub references Kathy Brown.

22. In addition to the clients listed above, other names on Esquivel's Stern ledger, while not necessarily tied to a dollar amount, have been confirmed to be plaintiffs represented by the Stern Law Group. Additionally, Stern and Esquivel have both stated that some of the payments are simply loans from Stern to Esquivel and are not related to any specific client. Based on the foregoing, evidence indicates that the ledger and the payments reflected thereon, which are comprised almost entirely of the $500,000 in checks that flowed from Stern to Plezia and then from Plezia to Esquivel, are related to personal injury clients handled by the Stern Law Group or are loans from Stern to Esquivel; the payments are not related to any work Esquivel performed on the BP benzene release.

23. In addition to documentary evidence indicating that the payments on Esquivel's ledger and Plezia's subpoena attachment were related to Stern personal injury clients, and not the BP benzene release, statements from other individuals actually involved in the BP benzene release matter contradict Plezia's statements on the matter. One of these individuals, attorney Dan Cartwright, actually had an agreement with Plezia to finance Esquivel's up-front costs on the BP benzene release. Notably, the agreement was signed August 20, 2010, only four days before the alleged August 24, 2010 agreement between Plezia and Stern, calling into question why Plezia would

enlist a second attorney, and further dilute his settlement proceeds, to pay costs he had just arranged to have paid four days earlier. When interviewed, Cartwright stated that he had, at Plezia's suggestion, agreed to fund Esquivel on the benzene matter. Cartwright produced a signed agreement dated August 20, 2010 memorializing his agreement. The agreement is signed by both Cartwright and Plezia. Notably, the purported August 24, 2010 agreement between Plezia and Stern is signed only by Plezia. Cartwright is corroborated by Esquivel, who states that Plezia had enlisted Cartwright, not Stern, to pay Esquivel's costs on the benzene matter. Additionally, Cartwright actually paid Esquivel's companies more than $85,000 in late 2010. Finally, Cartwright also stated that, if Stern was involved in the benzene matter in any way, Cartwright was unaware of it.

24.     In addition to Cartwright, investigators also interviewed Bridgit White, the only other attorney employed at Plezia's firm during the time of the benzene case. White specifically approached Plezia regarding the costs of the benzene matter because she knew Plezia had cash flow problems. Plezia told White that Plezia had enlisted Cartwright to fund the benzene effort. Plezia did not mention Stern to White. If Stern was involved in the benzene matter, White was unaware of it.

25.     Todd Richey, one of the primary medical providers on the BP benzene release matter, was also interviewed. Richey stated that, if Stern was involved in the matter, Richey was unaware of it. Richey does remember the involvement of attorney Dan Cartwright, among others. Richey further stated that, had he been aware of Stern's alleged involvement, he would not have participated in the matter.

26.     In addition to the documentary and testimonial evidence contrary to Plezia's story regarding the series of checks from Stern to him to Esquivel, Plezia himself signed a notarized document which contradicts his story. An "IRREVOCABLE ASSIGNMENT OF PROCEEDS" document signed by Plezia, Esquivel, and Stern in December of 2013 appears to contradict Plezia's story that the payments from Stern to him and then from him to Esquivel were payments made by Stern to fund Esquivel's work on the benzene matter, as outlined in the August 24, 2010 letter. Plezia states in his second interview with the government that he: 1) had an agreement with Stern to fund Esquivel's activities on the benzene matter; 2) that the agreement included the fact that the funds would flow through Plezia to Esquivel, and; 3) that the August 24, 2010 agreement loosely outlined the agreement. Both Stern and Esquivel state that none of the above is true. The government is in possession of two copies of the "IRREVOCABLE ASSIGNMENT OF PROCEEDS," an unsigned copy produced by Plezia in response to a subpoena and a signed copy produced by Esquivel as part of his Stern ledger.

27.     The very first sentence in the IRREVOCABLE ASSIGNMENT OF
        PROCEEDS reads, "In consideration of monies I, Marcus Esquivel owe to
        Jeffrey M. Stern hereby irrevocably and exclusively assign and transfer to
        Jeffrey M. Stern $500,000 of monies I receive from Richard J. Plezia for
        investigative work I performed on his behalf for BP Release cases (DOI April
        10, 2010)." The total amount of funds that flowed from Stern through Plezia
        to Esquivel was $507,000, closely approximating the $500,000 amount due
        per the assignment, indicating the funds in question are likely the same funds.
        If, as Plezia states, these payments were to fund, on Plezia's behalf, work
        performed by Esquivel on the benzene matter, then Esquivel would not owe
        any money to Stern and the assignment of proceeds would have no reason to
        exist. Rather, the money would be Esquivel's to keep, having earned it
        through his investigative work. Per Plezia's purported August 24, 2010 letter
        agreement, it would be Plezia, not Esquivel, that would owe the money to
        Stern because Stern would have advanced it to Esquivel, on Plezia's behalf,
        for work performed by Esquivel. According to the purported August 24, 2010
        letter, Plezia would have then repaid these advances to Stern out of Plezia's
        share of the benzene settlement proceeds. The second half of the first
        sentence acknowledges that Esquivel performed investigative work for Plezia
        on the benzene matter, but clearly indicates he had not been paid for all of it,
        neither by Stern nor Plezia. This contradicts Plezia's statements that the funds
        were paid by Stern to pay for Esquivel's work. Moreover, Plezia's actual
        contract with attorney Dan Cartwright resulted in the documented payment of
        over $85,000 from Cartwright to Esquivel for Esquivel's work on the benzene
        matter. Thus, Esquivel is already receiving payment from two sources for his
        benzene work: up-front from Cartwright and back-end from Plezia. This
        further negates Plezia's alleged need to enlist Stern to pay Esquivel's costs.

28.     The second sentence in the assignment states, "These monies are contingent
        only upon settlement and/or judgement obtained, if any, receipt of attorney
        fees, and subject to the previous agreement(s) between Marcus Esquivel and
        Richard J. Plezia." This sentence indicates that Plezia had a contingency
        agreement to pay Esquivel, a non-lawyer, a portion of any eventual settlement,
        which is illegal in Texas.

29.     In addition to contradicting Plezia, the assignment of proceeds document
        corroborates Stern and Esquivel, both of whom state that Esquivel owed
        money to Stern for illegal case advances and personal loans. As outlined
        previously, Esquivel's ledgers, court filings, and bank records clearly
        document that the payments from Stern through Plezia to Esquivel are either
        related to Stern personal injury plaintiffs or loans to Esquivel, not the BP
        benzene matter. The assignment confirms that Esquivel, in fact, owes these
        funds to Stern, as both men state. The document is signed by Plezia. Under
        the agreement purported to exist in Plezia's August 24, 2010 letter, no such
        debt would exist.

30.     On May 4, 2021, IRS-CI agents interviewed Sandra Lucero, who has been employed at Plezia's law firm since 2012 and is currently the firm's bookkeeper. Lucero is also a notary public. Lucero reviewed a copy of the signed "IRREVOCABLE ASSIGNMENT OF PROCEEDS." Lucero stated that she signed and notarized the document, and that Richard Plezia had signed the document in her presence. Lucero stated that she would have not notarized the document if Plezia had not signed it in front of her.

31.     In addition to reviewing the "IRREVOCABLE ASSIGNMENT OF PROCEEDS," Lucero also reviewed a copy of the purported August 24, 2010 letter agreement between Plezia and Stern. Lucero stated she did not recognize the document. Lucero pointed out that the letter was unusual in that it did not contain the initials of the individual that drafted the letter at the bottom of the page. According to Lucero, the policy at Plezia's law firm was to have Plezia' initials (RJP) at the bottom of the page followed by the initials of the person that drafted the document. If Plezia had drafted the document himself, the "RJP" initials should still appear at the bottom of the page but would not be followed by any other initials. If the letter was related to the BP benzene release, Lucero believed it should have been drafted by Lilia Sosa, who was the head paralegal on the BP benzene matter. Lucero has never seen a firm letter before that did not have initials at the bottom of the page. The firm has the policy regarding initials in place so that, in case of problems later on, it can be determined who drafted a piece of correspondence.

32.     In addition to lacking the drafter's initials, Lucero also noted that the August 24, 2010 letter was unusual in the fact that, although it indicated it had been sent via facsimile, the letter did not contain the recipient's fax number. Lucero stated that the firm's policy was to place the recipient's fax number on all letters to be faxed and that she had been trained to do so.

33.     Lucero stated that she was aware that Plezia had been served with a grand jury subpoena around 2018. Lucero was aware of the subpoena service because someone had left a business card with Karla at the front desk. Plezia did not really explain the subpoena to the staff at the law office. Plezia did not ask Lucero to pull together any documents in response to the subpoena. Plezia handled the subpoena response by himself.

34.     On May 5, 2021, IRS-CI agents interviewed Lilia Sosa, a former paralegal at Plezia's firm. Sosa stated that she had been hired around August of 2010 because Plezia had a large influx of clients related to the BP benzene release. Sosa was hired to work on the case and, within approximately one year, became the head paralegal on the matter. Sosa has no recollection of attorney Jeffrey Stern being involved in the BP benzene release. She does recall the involvement of Marcus Esquivel and attorney Dan Cartwright.

35.     Sosa reviewed a copy of the August 24, 2010 letter agreement.  Sosa stated
        she had not seen the document before.  Sosa stated that it is the policy of the
        Plezia law firm to have Plezia's initials in capital letters at the bottom of all
        correspondence followed by the initials of the individual that drafted the
        document in lower-case letters.  If Plezia drafted a document himself, his
        initials should appear in upper-case letters, but would not be followed by any
        additional initials.  Additionally, Sosa stated that it was standard practice at
        the Plezia law firm to include a recipient fax number in the header of any
        letter that was to be faxed.  The August 24, 2010 letter contains neither any
        initials at the bottom of the page nor the purported recipient's fax number.

### Location of the Evidence

36.     The discussion in the below paragraphs establishes probable cause that
        evidence concerning the described violations exists on computers and
        electronic storage devices located at the Plezia Law Firm.

37.     During a follow-up interview with IRS-CI on May 10, 2021, Sandra Lucero
        stated that "nearly all" documents at the Plezia law firm are scanned to the
        firm's electronic computer server.  Lucero stated that she scans all documents
        to the server and that other employees generally do the same, unless they are
        being lazy.  The documents scanned to the server would include Powers of
        Attorney (POA) for all Plezia clients.  Lucero stated that she was trained to
        scan all POA's to the server and that there is a specific sub-folder on the
        server for POA's.  Lucero added that no employee at the Plezia firm has
        authority to delete any information from the server.  When cases are closed at
        the Plezia law firm, electronic records are simply moved to a folder for closed
        cases on the server.

38.     Lucero also stated that all fax-related documents at the Plezia firm should be
        retained in both hard copy and electronic format.  According to Lucero,
        whenever a fax is sent from the Plezia law firm, the sender is required to use a
        cover sheet and to retain the cover sheet, the document being faxed, and a fax
        confirmation report in the appropriate client/case file.  The documents should
        be stapled together and placed in a file.  Additionally, the same set of
        documents (fax cover sheet, faxed document, and fax confirmation) should be
        scanned to the server.

39.     Lucero's statements are corroborated by Sosa.  According to Sosa, employees
        at the Plezia law firm always used a cover sheet when sending a document via
        fax and always retained the fax confirmation receipt.  After the fax was sent,
        the employee would scan the cover sheet, the faxed document, and the fax
        confirmation to the server.  A hard copy of the documents would also be
        retained in the appropriate file.  According to Sosa, if the August 24, 2010
        letter agreement had been sent via fax, a copy of the document, along with the

fax cover sheet and fax confirmation, should be on the computer server at Plezia's office.

40.     When interviewed, both Lucero and Sosa described a computer virus attack that struck Plezia's computer system.  According to both women, the virus encrypted some portion of the files on Plezia's server, making them inaccessible.  Following the attack, Plezia employees were responsible for re-scanning documents from their case files to the server so that electronic copies would be available.  Neither Lucero nor Sosa could remember specifically if the BP benzene case files were affected by the virus.  However, Sosa stated that, at the time she left Plezia's employment in December of 2016, which was after the computer virus, she was able to access all BP benzene files on the computer server.  Lucero stated that, if the August 24, 2010 letter was in the BP benzene file, it would have been re-scanned to the server after the virus attack.  Lucero also stated that she is currently able to access all the files she scanned following the attack.

41.     On May 20, 2021, IRS-CI agents interviewed Alan Roesch.  Roesch is an information technology (IT) specialist that performs contract IT work for several attorneys, including Richard Plezia.  Roesch stated that he performed a data migration and system upgrade for Plezia five or six years ago.  Roesch explained that Plezia had been using a small-business computer server that was beginning to fail.  Plezia had been using Buffalo terastations in conjunction with the server to store data.  Roesch installed a Synology box and a new server in virtualization for Plezia.

42.     Roesch received a call from Plezia several years ago about the virus attack at Plezia's firm.  Roesch, understanding that some of the files on Plezia's server had been encrypted, felt the situation was beyond his capabilities.  Roesch simply told Plezia to unplug his equipment and referred Plezia to another firm that specialized in ransomware.  Roesch does not know how or if Plezia resolved his situation.  Roesch cannot remember if the virus attack occurred before or after the upgrade Roesch performed for Plezia.  However, all data on Plezia's server at the time of the upgrade would have been migrated.

43.     Roesch stated that all of the data for the Plezia law firm is on the Synology box.  The Synology box would hold data such as .pdf files and Word documents.  Roesch installed the Synology box at Plezia's current office location on Hillcroft Avenue in Houston.  Plezia does not have any cloud storage that Roesch is aware of.

44.     At the time of his interview on May 20, 2021, Roesch stated that the last work he had performed for Plezia occurred "last week" (the week of May 10 through May 14, 2021).  Roesch did not go into Plezia's office to perform the work but performed it remotely.  Roesch stated that, based on the internet

protocol (IP) address he used to access Plezia's system, the Synology box installed by Roesch is still in place and still being used.

45.     Richard Plezia produced a copy of the August 24, 2010 letter agreement in response to a subpoena on September 28, 2018. Thus, the document existed, at least in hard copy, as of that date. That date was several years after the virus attack on Plezia's law firm computer systems. According to his current and former employees, that document should also exist on his current computer server, either in original form (if it was unaffected by the computer virus) or in a re-scanned format (if it was encrypted by the virus and re-scanned to the system). Knowing that the document was evidence in an ongoing grand jury investigation, the electronic document should not have been deleted by Plezia.

46.     The August 24, 2010 letter agreement referenced in the above paragraph was purported to be a business document created by the Plezia Law Firm. Your affiant knows that such documents are commonly created using word processing applications installed on laptop and desktop computers. Forensic analysis of the computers and electronic storage devices might reveal relevant details about this document such as the creation date and the author.

### Computers, Electronic Storage, and Forensic Analysis

47.     Computers include includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including network attached storage devices (NAS), desktop computers, laptops, notebook computers, virtual machines, and server computers.

48.     The term "electronic storage device" includes any physical object upon which computer data can be recorded. Examples include hard disks, external hard drives, NVMe drives, SSDs, backup drives, RAM, floppy disks, flash memory, thumb drives, CD/DVDs, and other USB drives.

49.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the premises. One form in which the records might be found is data stored on a computer's hard drive/internal memory or data on an electronic storage device. Thus, the warrant applied for would authorize the seizure/imaging of computers/electronic storage devices and/or the copying of electronically stored information from these devices, all under Rule 41(e)(2)(B). A later review of the associated extracted data from these relevant electronic devices would be conducted consistent with the warrant.

50.     I submit that if a computer or other electronic storage device is found on the premises, there is probable cause to believe those records will be stored on that computer or electronic storage device, for at least the following reasons:

51.     As previously mentioned, your affiant has learned from statements made by employees and the IT contractor that at least some of records described on the Attachment B are stored on an electronic storage device (Synology Network Attached Storage) located at Plezia's firm.

52.     Based on experience, I know computers and electronic storage devices located at a business are commonly used to create and maintain content related to the firm's professional activities.  This digital content might include but is not limited to the following: client records, contracts, customer agreements, invoices, other business documents, digital accounting records, calendars/appointments, emails, other messaging application conversations, notes, contact lists, internet history, and pictures/photos of business and financial documents.

53.     Additionally, based on my knowledge, training, and experience, I know that it is possible that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a digital storage medium, deleted, or viewed via the internet. Electronic files downloaded to digital storage media can be stored for years at little or no cost. Even when files have been deleted, they can possibly be recovered months or years later using forensic tools.

54.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from the operating system, or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

55.     Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

### Computer Forensic Evidence

56.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic

15

electronic evidence will be on any computer/digital storage media on the premises because:

57.    Data on the computer/electronic storage device can possibly provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

58.    As explained herein, information stored within a computer and electronic storage device may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or electronic storage device (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or electronic storage device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and electronic storage device activity can indicate how and when the computer or electronic storage device was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, digital storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage device access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage device may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The

existence of such image files, along with external device connection logs, may also indicate the presence of additional digital storage media devices (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

59.   A person with appropriate familiarity with how a computer works can possibly, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

60.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on computers/electronic storage device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

61.   Further, in finding evidence of how a computer/electronic storage device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

### Necessity of Seizing Computers and Electronic Storage Devices

62.   In most cases, a thorough search of a premises for information that might be stored on a computer/electronic storage device often requires the seizure of the physical device and a later off-site review consistent with the warrant. In lieu of removing the computer/ electronic storage devices from the premises, it is sometimes possible to make an image copy of the device's storage medium. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

63. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine the device's storage media to obtain evidence. Computers/electronic storage devices can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

64. Technical requirements. Computers/Electronic storage devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the electronic devices off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

65. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of digital storage media formats that may require off-site reviewing with specialized forensic tools.

66. Adhering to Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, and/or otherwise copying data from computers(described in Attachment B)/electronic storage devices (described in Attachment B) that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the extracted data consistent with the warrant.

### Summary

67. Based upon the foregoing, your affiant respectfully submits that probable cause exists to believe that Richard Plezia has made materially false statements to federal agents and attempted to obstruct justice through the submission of a fraudulent document in response to a grand jury subpoena. Plezia initially lied to investigators by telling them he had never paid Marcus Esquivel for specific case referrals, a practice which was at the heart of the ongoing grand jury investigation. Instead, as Plezia recounted to co-conspirators Marcus Esquivel and Jeffrey Stern, he had tried to throw the government off track or send them in a different direction. Plezia's false statements are directly contradicted by Esquivel, who is corroborated by his

ledger and insurance company files. These documents reflect that Plezia was, in fact, paying illegal kickbacks to Esquivel. Insurance files confirm that the individuals listed on Esquivel's Plezia ledger were, in fact, personal injury plaintiffs represented by Plezia's firm. According to Plezia's long-time bookkeeper, POA's for all these clients should be saved to Plezia's computer server. These POA's would be the best evidence that the individuals listed on Esquivel's ledger were, in fact, clients of the Plezia law firm.

68.     Plezia subsequently lied to investigators again, and provided a fraudulent document, in an effort to explain a series of payments that flowed from Stern through Plezia to Esquivel. Plezia told investigators that the payments were the result of an agreement between he and Stern to fund investigative costs accrued by Esquivel on the BP benzene release. Plezia provided a purported letter agreement dated August 24, 2010 between he and Stern to support his story. Both Esquivel and Stern state that Plezia's defense is a falsehood. Both men state that the payments through Plezia are kickbacks, advances, and loans from Stern to Esquivel and had nothing to do with the BP benzene release. Both men also state that Stern had absolutely nothing to do with the BP benzene release litigation and never entered into any such agreement with Plezia. Stern and Esquivel are corroborated by insurance records, court filings, financial records, and the testimony of other witnesses, including the attorney with whom Plezia actually had an agreement to fund Esquivel's costs on the BP benzene release. According to current and former Plezia employees, the August 24, 2010 letter agreement should be present on Plezia's computer servers. The document existed, at least in hard copy, as of September 28, 2018, when Plezia produced it to government investigators. If this document exists in electronic format on Plezia's computer system, the metadata associated with the file will provide the best evidence regarding the creation date of the document. Plezia also produced an unsigned copy of an "IRREVOCABLE ASSIGNMENT OF PROCEEDS" with his subpoena production on September 28, 2018. According to procedures outlined by current and former Plezia employees, this document should also be present on Plezia's server.

69.     Your affiant knows that the documents/records of evidentiary value described in this warrant are commonly created and maintained using word processing and other business-related applications installed on computers. Thus, the computers/electronic storage devices located at the firm could contain relevant data about the creation and maintenance of these document/records. The firm's computers/electronic storage devices could also contain contextual content related to these documents/records. In addition to the Synology NAS, the firm's other computers/electronic storage devices could also contain copies of the sought documents/records described in the affidavit and Attachment B.

70.    Your affiant further respectfully submits that there is also probable cause to
believe that evidence of the above-enumerated crimes, including false
statements in violation of 18 U.S.C. §1001 and falsification of records in
violation of 18 U.S.C. §1519, exists in electronic format at the offices Richard
J. Plezia and Associates located at **2909 Hillcroft Avenue, Suite 575,
Houston, Texas 77057**. According to Plezia's IT contractor, the data for
Plezia's law firm, including .pdf files and Word documents, is all stored on a
Synology box installed by the contractor at Plezia's law offices on Hillcroft
Avenue in Houston, Texas. Based on IP address access in May of 2021, the
IT specialist can confirm that the Synology box was still in use and still in
place. Electronic files are generally kept for long periods of time, often for
many years. No employee at the Plezia law firm had authority to delete stored
electronic files.

### Potential Privilege Issues

71.    This warrant seeks authority only to copy files and image hard drives from the
network-attached storage device and related computer equipment at Plezia's
law firm location. It does not seek authority to conduct a document search of
Plezia's law office. In order to minimize disruption to Plezia's practice, your
affiant requests authority to remove relevant electronic equipment from
Plezia's office during a late-afternoon or evening execution of the search
warrant on a Friday. The devices can then be transported to IRS-CI offices in
Houston, where files may be copied, and forensic images of the hard drives
contained in the network-attached storage devices can be made over the
weekend. The devices can then be returned to Plezia as early as possible the
next Monday. A delay of this schedule would only exist due to unresolved
technical issues related to gaining access to the seized devices or extended
copy times associated with extracting files caused by voluminous data or low
speed transmission medium. Defense counsel will be provided with a copy of
the resulting images and any data/files copied from the seized devices. In
order to ensure that privileged materials are not improperly viewed or seized
by the investigative team, the government, with input from defense counsel,
will devise a taint review procedure prior to commencing a search of the
imaged material. The taint review procedure will be submitted to the
magistrate for approval. The government will propose that a privilege team
be designated to conduct the search and to seize any relevant items. In order
to minimize the possibility that privileged information unrelated to current
investigation is viewed by the privilege team, it will be proposed that the
privilege team conduct the search of the seized electronic evidence using key
search terms or other limiting procedures. As previously stated, these search
terms and procedures will be developed in conjunction with defense counsel
prior to commencement of the search. The proposed privilege team will
consist of IRS-CI agents and an Assistant United States Attorney that are not
involved in the underlying investigation. Instructions will be given to the
privilege team prior to the search which set forth procedures, including the use

of key search words, designed to minimize the intrusion into privileged
material.  In this manner, the privilege team should not encounter documents
which are not relevant to the current investigation.  Under those proposed
procedures, all documents identified by the privilege team as potentially
relevant will be shared with defense counsel prior to disclosure to the
investigative team.  If defense counsel raises any privilege issues which
cannot be resolved with the privilege AUSA, the United States Attorney's
Office and defense counsel will seek judicial determination of the privilege
issues prior to any disclosure to the investigative team.

72.     The procedures outlined above will ensure that the determination of privilege
remains a judicial function throughout the review process.  Additionally, the
final agreement regarding the review process to be utilized will be made with
input from the defense counsel, not via an ex parte approval preceding the
search.  Finally, the anticipated procedures will eliminate the possibility that
the investigative team will have access to any non-relevant privileged material
and will limit the possibility that the privilege team will encounter such
material.  If the privilege team were to encounter such material, i.e. privileged
communications relating to clients not relevant to the subject investigation,
those clients would not be relevant to any known government investigation.
A review of the Public Access to Court Electronic Records (PACER) database
reveals that Plezia has been an attorney of record on sixty (60) matters in the
Southern District of Texas between 1994 and 2020.  On all but one of the
matters, Plezia or his firm represented the plaintiff in the proceeding, and
nearly all of the proceedings were personal injury, admiralty, Jones Act, or
product liability lawsuits.  The defendants in the lawsuits include fast-food
chains, retail stores, shipping companies, and offshore drilling companies.
These lawsuits corroborate the description of Plezia's practice that is provided
on the firm's website, which describes the firm as a "catastrophic injury and
civil litigation trial firm."  Only one of the 60 cases reflected in the PACER
database involves the federal government.  In that matter, Plezia represented
the plaintiff in a federal tort claim and the United States was the defendant.
However, that lawsuit was terminated in 1997.

73.   If feasible, a determination may be made to copy files from the relevant
       devices at the search warrant location prior to shut down and removal from
       the premises.


_____
Robert Simpson
Special Agent
Internal Revenue Service
Criminal Investigation


Sworn to me telephonically this 10th day of January 2022 and I find probable cause.


_____
Andrew Edison
United States Magistrate Judge Southern
District of Texas

**Schedule 1**
**PAYMENTS TO ESQUIVEL FROM STERN THROUGH PLEZIA**

**To Plezia & Associates From Jerffrey M. Stern, Attorney at Law** | | **From Plezia PC to Bel Mark International or Le Reve Advertising**

| Date | Check No. | Payee | Amount | Date | Check No. | Payee | Amount |
|------|-----------|-------|--------|------|-----------|-------|--------|
| 01/12/2011 | 19185 | Richard Plezia & Associates | 15,000.00 | 01/13/2011 | 15326 | Bel Mark International | 15,000.00 |
| 03/29/2011 | 19498 | Richard Plezia & Associates | 5,000.00 | 03/30/2011 | 15342 | Bel Mark International | 5,000.00 |
| 04/08/2011 | 19518 | Richard Plezia & Associates | 7,000.00 | 04/08/2011 | 15347 | Bel Mark International | 7,000.00 |
| 04/14/2011 | 19549 | Richard Plezia & Associates | 25,000.00 | 04/15/2011 | 15351 | Bel Mark International | 5,000.00 |
| | | | | 04/18/2011 | Cash | Bel Mark International | 20,000.00 |
| 04/28/2011 | 19599 | Richard Plezia & Associates | 25,000.00 | 04/29/2011 | 15355 | Bel Mark International | 25,000.00 |
| 06/24/2011 | 19772 | Richard Plezia & Associates | 10,000.00 | 06/24/2011 | 15371 | Bel Mark International | 10,000.00 |
| 07/08/2011 | 19828 | Richard Plezia & Associates | 19,000.00 | 07/08/2011 | 15382 | Bel Mark International | 16,000.00 |
| | | | | 07/08/2011 | 15388 | Bel Mark International | 3,000.00 |
| 08/23/2011 | 20000 | Richard Plezia & Associates | 25,000.00 | 08/23/2011 | 15408 | Bel Mark International | 17,000.00 |
| | | | | 08/23/2011 | 15409 | LeReve Advertising | 8,000.00 |
| 09/20/2011 | 20447 | Richard Plezia & Associates | 25,000.00 | 09/21/2011 | 15415 | Bel Mark International | 25,000.00 |
| 10/25/2011 | 21269 | Richard Plezia & Associates | 15,000.00 | 10/26/2011 | 15428 | Bel Mark International | 15,000.00 |
| 12/01/2011 | 21894 | Richard Plezia & Associates | 30,000.00 | 12/01/2011 | 15509 | Bel Mark International | 26,500.00 |
| 01/30/2012 | 22938 | Richard Plezia & Associates | 18,000.00 | 01/31/2012 | 15484 | Bel Mark International | 16,000.00 |
| 04/20/2012 | 24593 | Richard Plezia & Associates | 20,000.00 | 04/23/2012 | 15592 | Bel Mark International | 20,000.00 |
| 07/10/2012 | 25954 | Richard Plezia & Associates | 25,000.00 | 07/10/2012 | 15599 | Bel Mark International | 25,000.00 |
| 08/21/2012 | 26587 | Richard Plezia & Associates | 30,000.00 | 08/22/2012 | 15602 | Bel Mark International | 30,000.00 |
| 10/04/2012 | 27287 | Richard Plezia & Associates | 35,000.00 | 10/04/2012 | 15514 | Bel Mark International | 35,000.00 |
| 11/27/2012 | 28177 | Richard Plezia & Associates | 35,000.00 | 11/28/2012 | 15603 | Bel Mark International | 35,000.00 |
| 02/14/2013 | 29761 | Richard Plezia & Associates | 35,000.00 | 02/15/2013 | 15606 | Bel Mark International | 32,500.00 |
| 05/29/2013 | 32285 | Richard Plezia & Associates | 40,000.00 | Deposited directly to third party account. | | | 40,000.00 |
| 06/25/2013 | 32956 | Richard Plezia & Associates | 50,000.00 | Deposited directly to third party account. | | | 50,000.00 |
| 07/24/2013 | 33403 | Richard Plezia & Associates | 10,000.00 | Deposited directly to third party account. | | | 10,000.00 |
| 08/08/2013 | 33864 | Richard Plezia & Associates | 4,000.00 | Deposited directly to third party account. | | | 4,000.00 |
| 12/11/2013 | 36753 | Richard Plezia & Associates | 4,000.00 | Deposited directly to third party account. | | | 4,000.00 |
| | | | $ 507,000.00 | | | | $ 499,000.00 |

## <u>ATTACHMENT A</u>

## LOCATION TO BE SEARCHED

The location to be searched is the law offices of Richard J. Plezia and Associates, located in Suite #575 of the office building located at 2909 Hillcroft Avenue, Houston, Texas 77057, as further described below.

<u>The Location</u>

**2909 Hillcroft Avenue, Houston, Texas 77057** is a six-story office building located on the east side of Hillcroft Avenue at the intersection of Hillcroft Avenue and Unity Drive. The numbers "2909" appear on the top, right side of the building which faces Hillcroft Avenue. The word "HARTMAN" appears in blue lettering on the top, left side of the building facing Hillcroft Avenue. Suite #575 is located on the 5th floor of the building and faces the center atrium of the building. The suite is on the left side of the atrium when exiting the public elevator on the 5th floor.



2909 Hillcroft Avenue, Houston, Texas 77057



Suite # 575 – Offices of Richard J. Plezia and Associates

**ATTACHMENT B**

**ITEMS TO BE SIEZED:**

1. All electronically stored records and information relating to the described violations included in the warrant and involving Richard J. Plezia and Associates since August 1, 2010, which would indicate the following:

    - Records which would establish the creation date and time, as well as subsequent accesses, to a purported letter agreement between Richard J. Plezia and Associates and Jeffrey Stern relating to the BP Benzene Release and dated August 24, 2010, including records which would establish the creator of the agreement;

    - Records which would establish the creation date and time, as well as subsequent accesses, to an IRREVOCABLE ASSIGNMENT OF PROCEEDS dated on or about December 5, 2013, including records which would establish the creator of the agreement.

    Records may include relevant emails, other electronic correspondence or messaging, contracts and/or Powers of Attorney, agreements, calendar items, meeting minutes, notes, and other business-related law firm documents related to the August 24, 2010 letter agreement or the December 5, 2013 IRREVOCABLE ASSIGNMENT OF PROCEEDS.

2. Computers, Synology Network Attached Storage Device (NAS), and electronic storage devices (collectively referred to as the <u>relevant electronic devices</u>) which are reasonably believed to contain evidence of the criminal violations described in this affidavit including the above described documents/records.

3. For the computers, Synology Network Attached Storage Device (NAS), and electronic storage devices (<u>relevant electronic devices</u>) whose seizure and/or extraction of data is authorized by this warrant:

    a. Evidence who used, owned, or controlled the <u>relevant electronic devices</u> at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. Contextual content from other data/files contained on the relevant electronic devices related to the sought records/documents;

c. Evidence of software that would allow others to control the relevant electronic devices, such as viruses, trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d. Evidence of the lack of such malicious software;

e. Evidence indicating how and when the relevant electronic devices were accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

f. Evidence indicating the relevant electronic devices user's state of mind as it relates to the crime under investigation (such as internet browsing and search history);

g. Evidence of the attachment to the relevant electronic devices of other storage devices or similar containers for electronic evidence;

h. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the relevant electronic devices;

i. Computers, networking equipment, electronic storage devices, password lists, software, dongles, or encryption keys which might be necessary to gain access to the relevant electronic devices reasonably thought to contain evidence of the mentioned violations.  Optionally, forensic images and data might be extracted from these computers, networking equipment, and electronic storage devices believed to aid in gaining access to the relevant electronic devices;

j. Documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the relevant electronic devices;

k. Metadata, system files, registry data, link files, and other data related to the sought records/documents which would indicate such details as the author, affirmative user interaction, editing duration, creation date, modification date, delete date, print

date, and chronological order of creation/deletion related to other files on the device;

l. The lack of existence of the specific documents on the <u>relevant electronic devices</u> would also serve as evidence of the described violations based on facts mentioned in the affidavit.  In order to draw this conclusion, all obtained data and files (including possible deleted content) on the <u>relevant electronic devices</u> must be available for inspection/review;

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the seizure of the <u>relevant electronic devices</u> and/or copying/imaging of electronically stored information from these <u>relevant electronic devices</u> found in the premises described in Attachment A.  This warrant authorizes a later review of the <u>relevant electronic devices</u> and associated extracted data from these <u>relevant electronic devices</u> consistent with the warrant.  In the performance of this review, all data including deleted content is eligible for review to determine if the content falls within the items to be seized.

Review of the above extracted data will be conducted in accordance with the procedures set forth in the affidavit.  These procedures specifically refer to the handling of potentially privileged material by the investigative team and the privilege team.

**Definitions:**

The term **"Computer"** include includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including network attached storage devices (NAS), desktop computers, laptops, notebook computers, virtual machines, and server computers.

The term "**Electronic Storage Device**" includes any physical object upon which computer data can be recorded. Examples include hard disks, external hard drives, NVMe drives, SSDs, backup drives, RAM, floppy disks, flash memory, thumb drives, CD/DVDs, and other USB drives.

**Networking equipment** is defined as devices used to connect computers to internal and external networks.  Examples include routers, switches, firewalls, and modems.

For purposes of this affidavit and associated attachments, the terms "**records**", "**information**", and "**documents**" includes all forms of creation
or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

ATTACHMENT C

PRIVILEGE TEAM PRACTICES AND PROCEDURES

The government will propose that a privilege team be designated to conduct the search and to seize any relevant items.  In order to ensure that privileged materials are not improperly viewed or seized by the privilege team or the investigative team, the government, with input from defense counsel, will devise a taint review procedure prior to commencing a search of the imaged/seized material.  If the government and the defense reach an agreement regarding the taint review procedure, the taint review procedure will be submitted to the magistrate for approval.  If the government and the defense cannot agree upon the taint review procedures, the procedures will be devised with input from the magistrate.  In order to minimize the possibility that privileged information unrelated to current investigation is viewed by the privilege team, it will be proposed that the privilege team conduct the search of the seized electronic evidence using key search terms or other limiting procedures.  These search terms and procedures will be developed in conjunction with defense counsel prior to commencement of the search.  The proposed privilege team will consist of IRS-CI agents and an Assistant United States Attorney that are not involved in the underlying investigation.  Instructions will be given to the privilege team prior to the search which set forth procedures, including the use of key search words, designed to minimize the intrusion into privileged material.  In this manner, the privilege team should not encounter documents which are not relevant to the current investigation.  Under those proposed procedures, all documents identified by the privilege team as potentially relevant will be shared with defense counsel prior to disclosure to the investigative team.  If defense counsel raises any privilege issues which cannot be resolved with the privilege AUSA, the United States Attorney's Office and defense counsel will seek judicial determination of the privilege issues prior to any disclosure to the investigative team.